**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------ X

JACKELYN KELLER,                                        :

                              :  Civil Case No.:

              Plaintiff,          :

                              :

     v.                                                 :  **COMPLAINT**

                              :

ABOUT, INC. d/b/a DOTDASH,                     :

                              :  **Jury Trial Demanded**

                 Defendant.      :

------------------------------------------------------------X

       Plaintiff Jackelyn Keller alleges, against Defendant About, Inc. d/b/a Dotdash ("Dotdash"

or the "Company"), as follows:

## PRELIMINARY STATEMENT

       1.     "Superstar." "The ultimate partner." The "epitome of leadership." "Has a laser

focus on the business." "Tremendously talented." These are just some of the accolades Keller, a

highly successful advertising executive, earned for her work at Dotdash. Unfortunately, despite

her unparalleled work, Keller could never overcome the stigma of being a woman, a mother and

taking pregnancy leave.

       2.     For example, Dotdash demoted Keller after she announced that she was expecting

her second child because, according to a male Dotdash executive, it would be "impractical" for

Keller to continue her existing job duties "given her upcoming mat[ernity] leave." Dotdash also

prevented Keller from taking on new responsibilities because she was then "seven months

pregnant." Indeed, shortly after announcing her pregnancy, Keller was told that her "role [wa]s

to listen and learn" and not to "boss people around."

       3.     Such misogynistic treatment of women was part of the Company's culture. For

example, female professionals were told to be quiet, referred to as "girls" and made to take notes

during meetings. One female professional was disparaged for having an "annoying girly laugh." Indeed, the Company's Chief Executive Officer, Neil Vogel, expressed surprise that a female employee was "really smart, like guy smart."

4.      Keller also learned that she was being paid less than her comparable co-workers, including men and women without children.  She repeatedly asked Dotdash executives, who acknowledged the pay gap, to rectify the inequity.  They promised to do so but never did, eventually telling Keller that they were "out of chips" and could do no more.

5.      Keller complained repeatedly about the unlawful conduct, but things only grew worse, eventually forcing Keller to leave.

6.      Keller brings this action for violations of the antidiscrimination and antiretaliation provisions of the Family Medical Leave Act, 29 U.S.C. §§ 2601 *et seq*. ("FMLA"); Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*. ("Title VII"); the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"); New York State Human Rights Law, N.Y. Executive Law § 290 *et seq*. ("NYSHRL"); New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq*. ("NYCHRL"); Equal Pay Act, 29 U.S.C. § 206 *et seq*. ("EPA") and New York State Pay Equity Law, N.Y. Lab. Law § 194 *et seq*. ("NYSPEL").

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiff's rights under Title VII and the FMLA.

8.      The Court has supplemental jurisdiction over Plaintiff's related claims arising under New York state and city laws pursuant to 28 U.S.C. § 1367(a).

9.     Pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3), venue is proper in this district because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## PARTIES

10.     Keller is a resident of the State of New York and worked at Dotdash.  At all relevant times, Keller was an "employee" under all relevant statutes.

11.     Dotdash is a Delaware-registered domestic business corporation with a principal place of business located at 1500 Broadway, New York, New York 10036.  At all relevant times, Dotdash was an "employer" within the meaning of all applicable statutes.

## ADMINISTRATIVE PREREQUISITES

12.     On February 28, 2020, Keller filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging violations of discrimination and retaliation under Title VII.  On November 2, 2020, the EEOC issued a Notice of Right to Sue.

13.     A copy of this Complaint will be served on the New York City Commission on Human Rights and the Office of Corporation Counsel of the City of New York, thereby satisfying the notice requirements of the NYCHRL.

14.     All other prerequisites to the filing of this suit have been met.

## FACTUAL ALLEGATIONS

I.     **Background**

15.     Dotdash is a digital publisher that creates and publishes content across various categories, including health, beauty, travel and finance.

16.     At all relevant times, Dotdash had approximately 400 full-time employees.

17.    Keller holds a B.A. in English Communications from Yeshiva University and earned her M.B.A. from the Gabelli School of Business at Fordham University.  Prior to joining Dotdash, she worked within the revenue and sales organizations at premium brands, including Discovery Communications (Discovery Channel, TLC), Turner (TBS, truTV, Adult Swim, Cartoon Network), Univision Communications (El Rey Network) and The Atlantic.

18.    In March 2016, Dotdash hired Keller as Senior Director, Client Solutions, to oversee the Marketing Production Team.  When Keller joined Dotdash, her annual salary was $123,000 plus a 15 percent bonus.  Keller had two direct reports.

19.    Keller made an immediate impact on the business, and in April 2016, Keller earned additional responsibilities, overseeing Ad Product for the Revenue Team.  Her new title was Senior Director, Client Solutions and Ad Innovation, also known as the Production/Program Management and Ad Product teams.  For example, she streamlined internal workflows, onboarded an ad creation platform and hired a team of freelance designers and developers, all of which improved the quality of the Company's ad products and lowered the cost of building new products.  By July 2016, Keller had four direct reports.

## II.    **First Pregnancy**

20.    In August 2016, Keller announced her first pregnancy.

21.    Almost immediately thereafter, in or about September 2016, Keller learned that her Ad Product responsibilities were going to be removed and that one of her direct reports, whom she had recruited and trained, would be taken away.  Her new purview was to be solely Production/Program Management and she would have a new manager.

22.    Dotdash claimed that Keller's reassignment was part of a larger reorganization. In fact, Dotdash did not reorganize other than to diminish Keller's role.

4

23.     Such disparate treatment of women, especially those who have families and take protected leave, is not uncommon at Dotdash.  As result, virtually all members of Dotdash's C-Suite (senior executives with "Chief" titles) are  men.

24.     In October 2016, in an attempt to recover her career after announcing her pregnancy and being stripped of her responsibilities, Keller asked Chief Executive Officer ("CEO") Neil Vogel to establish a new Revenue Product team that she could lead.  While this position was a step down from Keller's pre-pregnancy job of overseeing both Marketing and Ad Product, she nonetheless hoped that it would allow her to regain her stature within the Company. Vogel accepted Keller's proposal, and in November 2016, Keller became Senior Director, Revenue Product.

25.     Keller did an excellent job in 2016 and received praise for her work in both roles. Her 2016 written performance review praised her for "exceeding expectations" and stated that Keller was "doing a fantastic job."  Additionally, Keller was described as a "[r]ockstar" and a "high potential leader in the company."

26.     Despite these accolades, Dotdash paid Keller less than her peers.  As part of the 2016 year-end review cycle, Keller's salary increased to $135,000 plus a 15 percent bonus. However, Keller's then manager, Chief Product Officer ("CPO") Tricia Han, revealed to Keller that Chief Financial Officer ("CFO") Tim Quinn refused to raise Keller's total compensation to match the compensation of her comparable colleagues.  Han instead offered Keller stock options to partially make up for the shortfall.

27.     On February 28, 2017, Keller went on her maternity leave and returned to work on May 24, 2017.

III.    **Return from First Maternity Leave**

28.     Shortly after returning from maternity leave, Keller began reporting to then Senior Vice President of Product Adam McClean.  McClean admitted to Keller that she was underpaid for her role and stated that he would try to remedy the issue.  Unfortunately, Dotdash did not fix the pay gap.

29.     Nonetheless, Keller continued to do excellent work for Dotdash.  Keller's 2017 mid-year review praised her "planning and management skills," and described her as both a "superstar" and "the ultimate partner."

30.     As a result of Keller's performance and leadership, she earned a promotion to Vice President ("VP"), Revenue Product.

31.     Keller's compensation, however, continued to lag behind her male colleagues. After her promotion, Dotdash increased Keller's salary by less than 10 percent, to $145,000, with a target bonus of 20 percent.

32.     Keller knew that comparable male VPs in the Product Organization sector at Dotdash earned a $200,000 salary.  McClean, who acknowledged that Keller was underpaid, stated that Quinn had resisted attempts to increase Keller's compensation.

33.     Keller's year-end 2017 review was, once again, outstanding.  She was described as a "tremendous talent and a key executive at the [C]ompany."  One reviewer stated that Keller's "customers and business partners were over the moon" because of her work.

34.     Because of her excellent 2017 performance, for 2018, Keller's salary was raised to $160,000 plus a 25 percent bonus.

35.     However, this was still below market value for a VP in the Product Organization at Dotdash and markedly less than the salaries of her peers.

36.     In October 2017, Andrew Gorenstein, the present President of Advertising and Partnerships, began asking Keller to work for him.  Gorenstein joined Dotdash in December 2016 as the President of Sales and Partnerships and he oversaw the Revenue Division.  He insisted that Keller was the best person to facilitate a good working relationship between the Product and Revenue teams and stated that he was confident that she would be able to help him deliver on 2018 revenue numbers.

37.     In February 2018, Gorenstein offered Keller a new position overseeing a newly created team, Revenue Strategy, where her job would be to "focus on the packaging positioning, and production of ad products."  Likewise, the Production/Program Management and Creative Strategy teams would roll into this new function.

38.     Gorenstein promised to increase Keller's salary to $200,000 plus a 25 percent bonus in her new position.  Upon information and belief, the promised increase would have finally made Keller's salary comparable to her male and non-pregnant  colleagues.

39.     But Gorenstein reneged on his promise.   While Gorenstein announced that Keller would move to the newly formed Revenue Strategy team, he refused to pay her the $200,000 salary he had promised.

40.     According to Gorenstein, he was "out of chips" and could pay Keller only $175,000.  Acknowledging that Keller was underpaid, Gorenstein claimed that he would "fix" the salary issue during the next pay cycle.  Although Keller transitioned to VP, Revenue Strategy, in March 2018, and began reporting to Gorenstein, he never fixed the salary issue, and her pay remained less than that of her peers.

41.     Thereafter, Keller met with Colleen Gangl, the VP of People ("HR"), to complain about the pay disparity between Keller and her comparable male colleagues.  Gangl did not correct the problem.

42.     Although Keller's pay was less than that of her peers, she nonetheless continued to excel at her job.  Keller hired and coached a strategy team, increased productivity within the Revenue Organization and partnered closely with fellow executives to deliver revenue growth. Keller was chosen to participate in IAC[1] Talent Meetings and represented Dotdash at various conferences, such as the MediaPost Publishing Insider Summit, the World Forum Disrupt - Women in Media Summit and the Product Marketing Summit.

43.     In the time period after Keller's latest promotion, Dotdash described Keller as the "driving force behind [the Company's] revenue product strategy" and stated that her "talent, expertise, and attitude are unparalleled in the industry."

44.     In August and September 2018, Keller met with Gangl in HR again to discuss the ongoing challenges concerning Gorenstein's behavior and the pay inequity.  Gangl did not dispute Keller's account.  Gangl acknowledged that Keller's relationship with Gorenstein was like "oil and water," and suggested that Keller should not be reporting to him, but rather that she should report to CFO Quinn.  Keller also reminded Gangl of the Company's promise to fix the pay gap.  Unfortunately, Dotdash made no changes and failed to even investigate Keller's serious concerns.

45.     Keller continued to raise the pay inequity issue with Gangl and Gorenstein throughout the remainder of 2018.

---

[1]     IAC is an American Holding Company that owns several brands including Dotdash.

46.     As in prior years, Keller's performance in 2018 was excellent.  Her colleagues praised her "leadership and vision," described Keller as the "epitome of what we want leaders to be at Dotdash," and "an incredible partner."

**IV.    Second Pregnancy**

47.     In mid-October 2018, Keller announced that she was pregnant with her second child.

48.     After announcing her second pregnancy and complaining about her unequal pay, Gorenstein began treating Keller poorly, including making sexist comments.

49.     Gorenstein believed that because Keller was a pregnant woman with children and an Orthodox Jew, she should remain submissive and was not committed to her work.  For example,

- Although Keller was a senior executive at the Company, Gorenstein told Keller that "her role is to listen and learn."

- He made fun of Keller in front of her colleagues for, in his words, liking to "boss people around."

- He joked, again in front of Keller's colleagues, about her maternity leave "plan" and regularly commented – sarcastically – that she would have her second baby "early," suggesting that she was not committed to [her] job and simply wanted to go on leave.

- He questioned how Keller could be both "Orthodox and a feminist," and then he made it clear that her family should be her main priority, suggesting, once again, that she was not committed to [her] job.

50.     Such sexist behavior was not unusual as Dotdash, which is permeated with "bro culture."  For example, men would speak over their female peers, engage in "mansplaining," roll their eyes when women spoke, tell women to be quiet, belittle female professionals as "girls" and ask them to take notes at meetings.   Indeed, Gorenstein made fun of a female direct report

because, in his words, she had an "annoying girly laugh."

51.     This sexist culture came from the top. Neil Vogel, CEO of Dotdash, expressed surprise that an accomplished female employee was "really smart, like guy-smart."  He also disparaged efforts to create an environment free of sexual harassment, stating at a company-wide All Hands prior to the company's holiday party and height of #MeToo movement, "things that would have been ok two year ago aren't ok."  In fact, sexual harassment and discrimination were just as unlawful in 2016 as they were in 2018, when Vogel made his sexist comment.

52.     Gorenstein also limited Keller's work responsibilities because of her pregnancy and gender.  Keller had planned a business trip to San Francisco.  Gorenstein, however, refused to let her go, stating that he wanted Keller to stay at "HQ" since she was pregnant.  There was, in fact, no medical reason for Keller not to travel at that time.

53.     Shortly thereafter, in or about March 2019, Keller learned that she had, once again, been demoted.  Dotdash stripped Keller of Revenue Strategy and Production responsibilities for the entire organization, which included several responsibilities that she received in February 2018.  Instead, Keller was relegated to the Company's "Lifestyle" division and was told she would begin reporting to a male peer, Jonathan Alt.

54.     Dotdash made it clear that Keller's pregnancy was the reason she had been demoted.  Quinn, the CFO who had resisted equalizing Keller's pay after her first pregnancy, stated that it would be "impractical" for Keller to continue in her prior role "given [her] upcoming mat[ernity] leave."

55.     Quinn opposed Keller taking on new responsibilities because, according to him, "you're seven months pregnant."

56.     Keller protested to Gorenstein that Dotdash's decision to demote her would be "a very different conversation if I wasn't pregnant" given her professional background and work performance.  In fact, Keller's Dotdash relationships and marketplace expertise warranted a promotion, not a demotion.

57.     Keller's demotion was accompanied by a cut in pay.  Although Keller was given a modest base salary increase from $175,000 to $183,500 (still less than the $200,000 annual salary her VP peers were paid), the Company adjusted its sales targets for 2019, thus lowering Keller's potential commissions and overall compensation.

58.     Keller again approached Gorenstein about the pay disparity.  Gorenstein became angry, telling Keller that he was "sick of having these types of conversations" and directed her to HR.  Keller complained to Gorenstein that her pay issues were related to her pregnancy.  She also notified HR of her concerns, once again, without success.

59.     On April 9, 2019, less than a month before Keller's due date, Dotdash promoted Tre Jones to Senior Vice President ("SVP") of Marketing.  Historically, such a role should have been offered to one of the then-most senior marketing executives in the Company, who at the time were Rob Stephen (who started at Dotdash more than a year after Keller), Meredith Worsham or Keller.  Like Keller, Worsham believed that having a baby while at Dotdash cost her the promotion opportunity.

60.     On April 12, 2019, before going on maternity leave, Keller had a final conversation with Gangl about the pay gap.  Gangl stated that she had spoken to Quinn and that Keller's salary would be reviewed "when and if [Keller] return[ed] in September." (emphasis added)

11

61.     Gangl's statement, suggesting that Keller might not return after her pregnancy, startled Keller as she had not previously stated, nor hinted, that she intended to resign.  To the contrary, she worked diligently to make sure that the work of her department continued while she was on temporary leave.

62.     On April 17, 2019, Keller began working from home in advance of her maternity leave, which was scheduled to begin on April 29, 2019.

**V.     Dotdash Replaces Keller**

63.     On April 29, 2019 – the date Keller was scheduled to be induced into labor – she learned that Dotdash had hired Nick Van Amburg to replace her.

64.     Concerned for her job, Keller expressed disappointment that no one at Dotdash had discussed with Keller the addition of Van Amburg.  Keller also reiterated her commitment to Dotdash and her desire to return in September 2019, given Gangl's ominous statement suggesting that Keller would not return after having a baby.

65.     Prior to taking her maternity leave, Keller spent months preparing her teams to thrive while she was out of the office.  The addition of Van Amburg, a VP-level consultant, was never part of those plans.  Indeed, Gorenstein and Gangl actively excluded Keller from the decision to hire Van Amburg.

66.     Gorenstein dismissed Keller's concerns about being replaced, stating that he did not want to "bug [Keller] when [she] had much more important matters at hand," referring to Keller's pregnancy.

67.     Gorenstein, and later Gangl, falsely stated to Keller that Van Amburg was merely a temporary hire.  In fact, Dotdash hired Van Amburg as a full-time VP (the same title Keller)

and formally gave him many of Keller's responsibilities, including the go-to-market strategy and positioning of ad products.  Moreover, while Keller was on maternity leave, Dotdash introduced Van Amburg to clients as filling Keller's position.

68.     The Company also paid Van Amburg $300,000 annually, significantly more than Keller for performing substantially similar work.

69.     The Company also pushed Keller aside in other ways.  On May 7, 2019, six days after Keller gave birth, Dotdash stripped Keller of responsibility for the Production/Program Management team.  Hal Rotholz, a man, replaced Keller.

70.     Moreover, shortly after Keller returned to work on September 4, 2019, Dotdash stripped her of sales marketing responsibilities for the "Beauty and Style" division, which had been under her purview before having her baby, as well as responsibility for brand marketing for all business units.

71.     Additionally, Dotdash excluded Keller from meetings, undermining her ability to do her job, including the bi-weekly Sellers-Helping-Sellers Revenue Team meeting.  According to Alt, Keller was not supposed to be in those meetings.  In fact, Alt invited Keller's male direct report.

## VI.   Dotdash's Self-Serving "Investigation"

72.     On or about July 11, 2019, Keller's counsel sent a letter to Dotdash detailing the persistent discrimination and retaliation she experienced.

73.     On or about August 7, 2019, Dotdash opened an investigation into the claims.

74.     However, Dotdash's "investigation" was merely a ruse meant to whitewash its unlawful conduct and create a false paper trail.

75.     Dotdash did not hire a neutral investigator.  Rather, it entrusted the investigation to Gangl, who had enabled and participated in the unlawful conduct.

76.     For instance, Gangl had been aware of Keller's pay complaints for well over a year.  Gangl conceded the pay disparity but failed to rectify the problem, promising only to review Keller's pay "if" Keller returned from her second maternity leave.

77.     Even more remarkably, Gangl participated in the unlawful decision to recruit and hire Keller's male replacement Van Amburg.

78.     In short, Dotdash's solution to Keller's complaints was to have Gangl, in effect, investigate herself.

79.     Unsurprisingly, Gangl was markedly confrontational with Keller during the investigation, including warning Keller not to "retaliate" against anyone.  In fact, there had been no complaints against Keller.  Gangl's warning, however, was an obvious signal to Keller that she (Keller) could face discipline if she proceeded with her allegations against the Company.

80.     Moreover, rather than focus on gathering facts, Gangl frequently became combative when Keller pressed her claims.  For example, Gangl fired back when Keller stated that Van Amburg was brought in to take over Keller's responsibilities.  Gangl browbeat Keller, claiming that Van Amburg was merely a "contractor," and spoke to Keller in a demeaning manner stating, "Do you understand that he is a consultant?"  In fact, Van Amburg has since become a permanent Dotdash employee.

## VII.   **Dotdash Forces Keller to Leave**

81.     Dotdash's retaliation continued even after it launched its "investigation."

82.     For example, Dotdash removed Keller from all "Beauty and Style" accounts.

83.     Dotdash also took away responsibilities from Keller, such as ownership for "Liquor.com" core marketing deliverables and driving the revenue strategy for the "Content to Commerce" initiative.  The Company gave those responsibilities to Van Amburg.

84.     The Company also began to micromanage Keller following her return.  Keller was required to draft a "coverage" document specifying work responsibilities in advance of a trip to Israel.  This was not required of Keller prior to her most recent maternity leave and complaints of discrimination.

85.     Dotdash also denied Keller necessary resources, including new hires, and attempted to take freelance resources away from Keller.  For example, Dotdash dismissed a vital contractor on Keller's team and repeatedly attempted to transfer Keller's direct reports to other business units.

86.     Finally, and most disturbingly, the Company attempted to force Keller to fire Micky Teng, Director, Creative Strategy.  Teng was a top performer who was being pushed out after she raised her own claims of discrimination and supported Keller's allegations.  Keller reasonably believed that Dotdash's decision to fire Teng was retaliatory and refused to do so.

87.     By April 2020, Dotdash had eliminated many of Keller's responsibilities and severely diminished her compensation potential.  Based on Keller's experience with her prior complaint, she knew complaining to HR would be futile and that the Company would not properly investigate her complaints or remedy the unlawful conduct.

88.     It was clear that Dotdash had no interest in continuing to employ Keller and had no intention of providing her the same opportunities as her male and non-pregnant peers who had not complained of discrimination.

89.     As such, on April 17, 2020, Dotdash constructively discharged Keller.

## FIRST CAUSE OF ACTION
### (Unlawful Interference and Retaliation in Violation of the FMLA)

90.     Plaintiff repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs, as though fully set forth herein.

91.     By the actions described above, among others, Defendant violated the FMLA.

92.     Defendant's unlawful conduct was willful.

93.     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered, and continues to suffer, monetary and other harm.

## SECOND CAUSE OF ACTION
### (Discrimination in Violation of Title VII)

94.     Plaintiff repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

95.     By the actions described above, Defendant discriminated against Plaintiff on the basis of her sex and/or pregnancy in violation of Title VII.

96.     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm.

97.     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered, and continues to suffer, injury, pain, ailments and conditions, as well as mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and other emotional pain and suffering.

98.     Defendant's unlawful and discriminatory actions constitute malicious, willful and wanton violations of Title VII.

### THIRD CAUSE OF ACTION
**(Retaliation in Violation of Title VII)**

99.     Plaintiff repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

100.     By the actions described above, among others, Defendant retaliated against Plaintiff in violation of Title VII.

101.     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm.

102.     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered, and continues to suffer, injury, pain, ailments and conditions, as well as mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and other emotional pain and suffering.

103.     Defendant's unlawful and retaliatory actions constitute malicious, willful and wanton violations of Title VII.

### FOURTH CAUSE OF ACTION
**(Unequal Pay in Violation of the EPA)**

104.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

105.     By the acts and practices described above, Defendant violated the EPA by paying male employees higher wages than Plaintiff for substantially equal work.

106.     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered, and continues to suffer, monetary and other harm.

107.    Defendant's conduct was willful and/or showed reckless disregard for Plaintiff's statutorily protected rights.

### FIFTH CAUSE OF ACTION
### (Retaliation in Violation of the EPA)

108.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

109.    By the acts described above, Defendant retaliated against Plaintiff for engaging in protected activity under the EPA.

110.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered, and continues to suffer, monetary and other harm.

111.    Defendant's conduct was willful and/or showed reckless disregard for Plaintiff's statutorily protected rights.

### SIXTH CAUSE OF ACTION
### (Discrimination in Violation of the NYSHRL)

112.    Plaintiff repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

113.    By the actions described above, among others, Defendant discriminated against Plaintiff on the basis of her gender, familial status, pregnancy and religion in violation of the NYSHRL.

114.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered, and continues to suffer monetary and/or other economic harm.

115.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered, and continues to suffer, injury, pain, ailments and conditions, as well as mental anguish

and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and other emotional pain and suffering.

116.     Defendant's unlawful actions constitute malicious, willful and wanton violations of the NYSHRL.

## SEVENTH CAUSE OF ACTION
### (Retaliation in Violation of the NYSHRL)

117.     Plaintiff repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

118.     By the actions described above, among others, Defendant retaliated against Plaintiff in violation of the NYSHRL.

119.     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm.

120.     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered, and continues to suffer, injury, pain, ailments and conditions, as well as mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and other emotional pain and suffering.

121.     Defendant's unlawful actions constitute malicious, willful and wanton violations of the NYSHRL.

## EIGTH CAUSE OF ACTION
### (Discrimination in Violation of the NYCHRL)

122.    Plaintiff repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

123.    By the actions described above, among others, Defendant discriminated against Plaintiff on the basis of her gender, familial status, pregnancy and creed in violation of the NYCHRL.

124.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm.

125.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered, and continues to suffer, injury, pain, ailments and conditions, as well as mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and other emotional pain and suffering.

126.    Defendant's unlawful actions constitute malicious, willful and wanton violations of the NYCHRL.

## NINTH CAUSE OF ACTION
### (Retaliation in Violation of the NYCHRL)

127.    Plaintiff repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

128.    By the actions described above, among others, Defendant retaliated against Plaintiff in violation of the NYCHRL, including.

129.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has

suffered, and continues to suffer, monetary and/or other economic harm.

130.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has

suffered, and continues to suffer, injury, pain, ailments and conditions, as well as mental anguish

and emotional distress, including, but not limited to, depression, humiliation, embarrassment,

stress and anxiety, loss of self-esteem and self-confidence, and other emotional pain and

suffering.

131.    Defendant's unlawful and retaliatory actions constitute malicious, willful and

wanton violations of the NYCHRL.

### TENTH CAUSE OF ACTION
**(Unequal Pay in Violation of the NYSEPA)**

132.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each

of the preceding paragraphs as if fully set forth herein.

133.    By the acts and practices described above, Defendant violated the NYSPEL by

paying male employees higher wages than Plaintiff for substantially similar work.

134.    Plaintiff has suffered and will continue to suffer damages as a result of

Defendant's willful and unlawful conduct unless and until this Court grants relief.

135.    Defendant's conduct was willful and/or showed reckless disregard for Plaintiff's

statutorily protected rights.

### ELEVENTH CAUSE OF ACTION
**(Retaliation in Violation of the NYSEPA)**

136.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each

of the preceding paragraphs as if fully set forth herein.

137.    By the acts described above, Defendant retaliated against Plaintiff for engaging in protected activity under the NYSPEL.

138.    Plaintiff has suffered and will continue to suffer damages as a result of Defendant's willful and unlawful conduct unless and until this Court grants relief.

139.    Defendant's conduct was willful and/or showed reckless disregard for Plaintiff's statutorily protected rights.

**TWELFTH CAUSE OF ACTION**
**(Discrimination in Violation of 1981)**

140.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

141.    By the acts described above, Defendant discriminated against Plaintiff based on her race in violation of Section 1981.

142.    Plaintiff has suffered and will continue to suffer economic and compensatory damages as a result of Defendant's unlawful conduct unless and until this Court grants relief.

143.    Defendant's conduct was willful and/or showed reckless disregard for Plaintiff's statutorily protected rights.

**THIRTEENTH CAUSE OF ACTION**
**(Retaliation in Violation of Section 1981)**

144.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

145.    By the acts described above, Defendant retaliated against Plaintiff for engaging in protected activity under Section 1981.

146.    Plaintiff has suffered and will continue to suffer economic and compensatory

damages as a result of Defendant's willful and unlawful conduct unless and until this Court grants relief.

147.    Defendant's conduct was willful and/or showed reckless disregard for Plaintiff's statutorily protected rights.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendant, through the following relief:

A.    A declaratory judgment that the actions of Defendant complained of herein violate the laws of the United States, the State of New York and City of New York;

B.    An injunction and order permanently restraining Defendant from engaging in such unlawful conduct;

C.    An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including but not limited to past and future lost earnings;

D.    An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to her professional and personal reputations and loss of career fulfillment;

E.    An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including but not limited to, emotional pain and suffering and emotional distress;

F.    An award of punitive damages in an amount to be determined at trial;

G.    An award of liquidated damages in an amount to be determined at trial;

H.      An award of attorneys' fees and costs that Plaintiff has incurred in this action to the fullest extent permitted by law; and

I.      Such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated:  January 11, 2021
        New York, New York                          Respectfully submitted,

                                                    **WIGDOR LLP**

                                                    By: _____
                                                          Valdi Licul

                                                    85 Fifth Avenue
                                                    New York, NY 10003
                                                    Telephone: (212) 257-6800
                                                    Facsimile: (212) 257-6845
                                                    vlicul@wigdorlaw.com

                                                    *Attorneys for Plaintiff*